**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
35 WEST FIFTH STREET
COVINGTON, KY 41011**

Eastern District of Kentucky
**F I L E D**

**MAY 2 0 2020**

AT COVINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

**DATE FILED:  May 12th, 2020**

| | |
|---|---|
| **WILLIAM C. SHEHAN, JR., et al.,**<br>903 Riva Ridge Court<br>Union, KY  41091 | )<br>)<br>)<br>) CASE NO.: |
| Plaintiff, | )<br>)<br>) |
| vs. | )<br>)<br>) |
| **UNITED STATES DEPARTMENT OF JUSTICE**<br>950 Pennsylvania Avenue, NW<br>Washington, D.C.  20530 | ) Paycheck Protection Program<br>)<br>)<br>) |
| **FEDERAL JUDGE, DAVID BUNNING** | ) |
| **FEDERAL JUDGE, WILLIAM O. BERTELSMAN** | ) |
| **FEDERAL JUDGE, SUSAN DLOTT** | ) |
| **FEDERAL I.R.S. AGENT, SUSAN PALMISANO** | ) |
| **FEDERAL D.O.J. OFFICER, LOUIS DE FALAISE** | ) |
| **FEDERAL OFFICER, KIMBERLY HEIDEL** | ) |
| **U.S. ATTORNEY, BOB MCBRIDE** | ) |
| **FEDERAL OFFICIALS, 1 THROUGH 5** | ) |
| et al.,                    Defendants, | )<br>) |

# CIVIL COMPLAINT

---

The undersigned has served a copy of this NOTICE, by mailing vis the U.S. Postal Service or e-mailing a copy on this 12th day of May 2020, to the following recipients:

### UNITED STATES DEPARTMENT OF JUSTICE
U. S. Attorney's Office
207 Grandview Drive, Suite 400
Fort Mitchell, KY 41017

Tylene.cronin@usdoj.gov

### KENTUCKY SUPREME COURT
Honorable Chief Justice, John D. Minton, Jr.
700 Democrat Drive, # 209
Frankfort, KY 40601

### BOONE COUNTY CIRCUIT JUDGE
Honorable Judge, J.R. Schrand
6025 Rogers Lane
Burlington, KY 41005

### P N C BANKING CORPORATION
Mr. Gregory P. Jordan, General Counsel
201 East Fifth Street
Cincinnati, OH 45202

pnccares@pnc.com

### U.S. DISTRICT JUDGE
### Honorable David L. Bunning
U.S. District Court, Eastern District of Kentucky
Covington, KY 41011

### U.S. DISTRICT JUDGE
### Honorable William O. Bertlesman
U.S. District Court, Eastern District of Kentucky
Covington, KY 41011

**U.S. DISTRICT JUDGE**
**Honorable Susan J. Dlott & Stanley Chesley**
U.S. District Court, Southern District of Ohio
Potter Stewart Courthouse
Cincinnati, OH  45202


**SENIOR PROBATION OFFICER**
**Kimberly Heidel**
U.S. District Court
Covington, KY 41011


**I.R.S. AGENT, SUSAN PALMISANO**
U.S. Internal Revenue Service – Internal Affairs
550 Main Street
Cincinnati, OH  45202


**U.S.A., ROBERT MCBRIDE, LOUIS DE FALAISE**
U.S. Department of Justice
260 West Vine Street, Suite 300
Lexington, KY  40507 – 1612


WILLIAM C. SHEHAN, JR.

Pro Se Plaintiff

May 12th, 2020

Date

# VENUE

The United States District Court for the Eastern District of Kentucky, under normal circumstances, would be the proper venue for this matter.   How the Plaintiff recently filed very serious claims and allegations against Federal Officials in the Eastern District who Conspired with The Bank of Kentucky, BB&T Bank, now Truist Financial Corporation.

The Complaint related to those claims and allegations was filed in the United States Court of Appeals for the Sixth Circuit in Cincinnati, OH, on January 31st, 2020, hereafter referred to as the First Complaint.   Defendants named in the First Complaint are also named in this Complaint.

On May 12th, 2020, the Court of Appeals replied with guidance on multiple topics. Therefore, it is necessary to initiate claims involving the Paycheck Protection Program first, in a United States District Court.

# JURISDICTION

The United States Federal Courts are the proper jurisdiction for this matter based on the subject matter pertaining to the federal Paycheck Protection Program.   PNC Bank is a large company with offices, branches and ATM facilities spread across multiple states including Northern, Kentucky and downtown Cincinnati, OH.

The United States Department of Justice maintains offices and representation in all fifty of these United States.

# PARTIES IN THIS ACTION

## BILL SHEHAN, JR.:

Mr. Shehan is a life-long resident in the State of Kentucky where he resides at 903 Riva Ridge Court, Union, KY in Boone County.   Since 1994, Shehan formed and operated many businesses, one of which is, L.T.C. Signature Environments, LLC, doing business as, Larson Theme Construction. Larson specializes in the design and development of innovative attractions and theme environments for major tourist destinations.

## PNC FINANCIAL SERVICES GROUP, (PNC BANK):

PNC Bank is part of the PNC Financial Services Group, a large financial services company focused on provide credit facilities to businesses and individuals in many states. PNC Bank has multiple locations in Ohio with a primary location in downtown Cincinnati. PNC Bank may become part of this action based on its role in the federal Paycheck Protection Program and subsequent refusal to approve the Plaintiff's application.

## UNITED STATES DEPARTMENT OF JUSTICE:

The United States Department of Justice is a federal executive department responsible for the enforcement of law and administration of justice in the United States of America. The Department of Justice is part of this action based on damages caused to the Plaintiff through a tax case, the First Complaint, which now form the basis as to why PNC refuses to submit the Plaintiff's application to the Small Business Administration.

It is understood that all Defendants will be represented by the Department of Justice. All Defendants are named in their official capacities as federal employees and officials of the United States government. However, criminal conduct negates immunity.

## SMALL BUSINESS ADMINISTRATION:

The Small Business Administration is a United States government agency that provides support to entrepreneurs and small businesses. The mission of the Small Business Administration is "to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters".

The Small Business Administration offered the Paycheck Protection Program (P.P.P.) to all businesses in the United States as necessary to offset the explosive loss of jobs across the nation because of the covid-19 pandemic. The P.P.P. requires that applicants be in business prior to the pandemic and suffered a loss as a result of the economic downturn.

# COMPLAINT

1.  Plaintiff, William C. Shehan, Jr, brings this action before the Court seeking relief and damages in relation to the Plaintiff's application to participate in the Small Business Administration's Paycheck Protection Program (P.P.P.)   This action is currently limited to claims involving the Paycheck Protection Program.


2.  After multiple attempts to gain acceptance into the P.P.P., information in the public record, the result of actions by Defendants in the First Complaint, led to the rejection of Shehan's applications.    In each application, the S.B.A. requires the social security number of the individual applying on behalf of a company.  Based on documents received from banks where Shehan applied, Shehan's company's applications were rejected based on information in public files - accessed through his individual social security number.  Banks are using information connected to Shehan's personal social security number as the basis for rejecting the applications for his company.   The information on file is the result of actions and violations by Defendants in the First Complaint, which may soon be filed in the Eastern District of Kentucky.


3.  Shehan filed an application to participate in the paycheck protection program around April 14th, 2020 through PNC Bank where Shehan has holds all personal and business accounts since 2013 and 2015.   The application was filed prior to the opening of the second round of the P.P.P. so that Shehan's company would be

included and benefit.   The purpose of the program is to offer capital to cover damages caused by the government's shutdown of the economy in relation to the Covid-19 pandemic.

4.     The application requests details about felony convictions in the last five years but, does not extend beyond that five-year period.   As indicated by the S.B.A., issues connected to felony convictions older than five years should not be part of the criteria utilized in the approval of a company's P.P.P. application.   In addition, the inability to provide specific documents because of issues older than five years should not be part of the criteria for approval.   In view of the circumstance, Shehan's application should have been approved and processed.   It was not.   The application number issued by PNC Bank is:  249126.

5.     Shehan owns a company that specializes in the design and construction of theme and entertainment attractions for theme parks, water parks, resorts, zoos, animal parks, marine parks, and museums around the world.    Shehan began in the business in 1994 when he started a company called Man Made Wonders which delivered numerous successful projects for The Cincinnati Zoo, Kings Island, The Beach Water Park, Khron Conservatory, Universal Studios Orlando, Six Flags, Simon Properties Group, HRH Sheikh Mohammad bin Rashid of Dubai, Universal Studios Dubai, Tatweer, Nakheel and many, many others.

6.   In 2004, Shehan purchased The Larson Company of Tucson, AZ and combined the companies to operate as Larson Theme Construction.   In 2005, Defendants in the First Action launched a criminal investigation designed to suppress Shehan's testimony in Kentucky's Fen Phen case and People's Bank matter, both cases that came before the United States District Court, in the Eastern District of Kentucky.

7.   As a result of damages caused by Defendants in the First Action, Shehan combined operations and filed corporate formation documents on August 1st, 2015 in the State of Kentucky.   He has served as the President and C.E.O. of this company and is the sole member of L.T.C. Signature Environments, LLC, doing business as Larson Theme Construction.

8.   As confirmed in the application to PNC Bank, Shehan's business was formed in 2004 and 2015 but, was not active in the United States in 2019.

9.   The theme and entertainment sector in the U.S. and around the world are hit especially hard by the covid-19 virus, causing many parks, attractions, and hotels to remain closed for the season.   Prior to Damages caused in the First Action, Shehan's company, Larson Theme Construction, delivered numerous high-profile projects for Walt Disney World, Universal Studios Orlando, SeaWorld and many others, all parks and facilities which are now mostly closed.

10.    In the weeks leading up to the economic impact caused by the covid-19 virus, Shehan signed a personal and corporate contract with a local hotel / water park complex in relation to $3,500,000 in water park equipment.

11.    Details of the project were provided to PNC Bank which requires 28 craftspeople and 4 administrative staff, who are currently not working, to execute a scope of work on-site for approximately 90 days or until completion. All details, photos and scope were provided to PNC Bank in advance of the opening date of the P.P.P.'s second round.

12.    PNC Bank gave the impression the application was submitted to the S.B.A. until May 2nd.  As the P.P.P. reached its last days, PNC Bank sent an email to Shehan requesting additional documents which cannot be provided.  PNC Bank provided no personal contact details, no phone number and no address and issued instruction not to take this matter to any local branches.  On May 3rd, Shehan was contacted by a very friendly and professional PNC customer service representative who worked diligently to assist Shehan in processing the application.

13.    However, PNC Bank breached the contract, agreement, terms and conditions extended by the Small Business Administration to Shehan's business by relying on false information contained in the public record under Shehan's personal social security number.  Moreover, after doing business with PNC Bank since 2013, PNC

Bank is aware or should be aware of the circumstances surrounding Shehan's businesses and tax case as required by banking laws.   As a result, PNC Bank remains liable for all benefits which Shehan has been deprived in relation to the P.P.P. and future value and benefit created as an extension from the first and second round, and all subsequent programs from the S.B.A.

14.   The P.P.P. is the second significant opportunity or project where damages caused by Defendants in the First Action are continuing to have a devastating impact on the Plaintiff's ability to re-establish a foundation for his businesses and family. The first project where Shehan suffered is connected to the $200 million cancer facility currently under construction by Turner Construction Company for the Saint Elizabeth Healthcare Corporation.   Shehan intends to refile that action once a more suitable Judicial Structure is in place.

15.   Obtaining acceptance in the P.P.P. will provide momentum to move through the covid-19 economy by providing capital to cover the cost of 28 on-site jobs and 4 support staff.   The funds will be beneficial at all levels.

16.   As necessary to support and reinforce the allegations, claims and charges leveled against the United States and Defendants in the First Complaint, the Plaintiff submits into the public record, the following set of exhibits and events which are meaningful and compelling.

17.    The allegations outlined in the Complaint are centered around the utilization of a
       federal tax case as a weapon across three high-profile criminal prosecutions.   The
       tax case was used to suppress Shehan's testimony in Kentucky's Fen Phen case,
       The People's Bank matter and the Florence Baptist Church's claim of bank fraud
       against BB&T Bank, now Truist Financial Corporation, and others.

18.    To open the timeline, the Bank's Conspiracy was identified during the civil audit
       process in late 2002 and early 2003 by tax attorney Martin Horwitz.  Horwitz then
       commenced an investigation and maintained the investigation for many years.

19.    Horwitz learned that a high ranking official in Washington, DC, wanted to
       prosecute Shehan, that the Conspiracy was somehow connected to the Florence
       Baptist Church, and those involved were not going to allow the case to settle, and
       the case "was not going to go away."   For over a decade, it was not fully clear how
       the events and motives were connected because the evidence and proof was being
       concealed in a variety of methods.   However, as timed passed, the initial
       intelligence outlined above was proven incredibly accurate, down to every detail.

20.    Upon learning of the political prosecution scheme in Washington, Horwitz
       developed a strategy that required elevating the civil tax liability as needed to
       prevent criminal prosecution.   His strategy worked.  Gloria Ferng, the auditor for

the I.R.S., closed the audit process and transferred the case to civil collections. As part of the strategy, Horwitz advised Shehan to accept all I.R.S. positions and challenge none.   There is no evidence suggesting Gloria Ferng is involved in the Conspiracy.

21.   Referring to pages contained in the **Internal Revenue Service's Case History Transcript**, relevant details in this matter are shown on page 2 in Exhibit 001. On February 10th, 2004, Revenue Agent, Linda Edwards, places a telephone call to Auditor, Gloria Ferng, to discuss the tax case.  During the call, Agent Ferng, states two facts:  1) "his only asset is the business", and 2) "The taxpayer's intention at the time of the audit was to submit an O.I.C."   The O.I.C. is a formal program to settle outstanding taxes due, more commonly referred to as Offer-In-Compromise. Gloria Ferng suggested this program as the path to a successful resolution of the case.   This exchange between these two agents, accurately identifies the second part of Horwitz's strategy to avoid political prosecution.   Firstly, elevate the tax obligation by millions, and Secondly, resolve the matter through the O.I.C. program.

22.   Exhibit 002 displays a legal notice of the matter to the The Bank of Kentucky. However, Bob Zapp, Jr., President for The Bank of Kentucky was aware of potential tax liabilities to the I.R.S. as early as 1997.   In the years before, Bob Zapp, Jr., was Shehan's friend, Bible Study teacher, a friend of the family and personal banker to the Shehan Family and their businesses.

23.     Shehan's intentions to resolve the tax liability through the Offer-In-Compromise program are clearly demonstrate in Exhibit 003 and Exhibit 004.     The first amount offered is $300,000.     The amount is important.

24.     In February of 2005, the Internal Revenue Service was made fully aware that Shehan was using his company bank accounts to pay personal expenses.   This was happening at the same time Martin Horwitz was negotiating a settlement of the taxes due.   Exhibit 005 and Exhibit 006 showcase the single charge to which Shehan was forced to plead guilty.   Shehan was using his company bank account to pay taxes to the State of Kentucky, tithes to his Church and the lease on his home.   These are the checks in which U.S. Attorney, Bob McBride, utilized as grounds for prison.   However, notice the date of February 11, 2005 – compared to November 10th, 2010, the date in which McBride secured his indictment, as shown in Exhibit 024 – a gap of almost six years!   The gap of nearly 6 years raises a multitude of very serious issues as explained in the following pages.

25.     The Internal Service requested the services of an auditor to determine the value of Shehan's business.   Recall that Exhibit 001 confirms Shehan's only asset is his business.   Linda Edwards, on June 1st, 2005, writes on page 32 in Exhibit 006, "They valued the business enterprise of Man Made Wonders to be $228,000." Therefore, Shehan offered the full value of his company, all his assets, plus an additional 32%, a premium over assets of $72,000, to resolve a tax liability.   The offer was mysteriously rejected.

26.  On August 3rd, 2005, Linda Edwards outlined Shehan's motives and objectives in explicit detail.  Edwards writes for the I.R.S., "Taxpayer's plan is to submit an O.I.C. by October 15th, 2005.  He plans on financing the O.I.C. with funds from his father."  All made very clear in Exhibit 007.

27.  Exhibit 008 displays Shehan's second offer of $500,000 - almost twice the value of his only asset valued at $228,000.    The timing of this second offer was determined by Martin Horwitz who received information indicating those who were Conspiring against Shehan in the tax case, were putting their plan into action.  As the evidence will confirm, in a matter of hours, Horwitz's intelligence was bullseye accurate.   At that time, Horwitz did not know who was behind the scheme or their motives.

28.  Horwitz believed the offer of $500,000 would be sufficient to prevent any prosecution and the I.R.S. would accept the offer.  Horwitz would learn later why the offer was not accepted.

29.  The very next day, on August 4th, 2005, Linda Edwards writes, "TC (telephone call) from S.A. Susan Palmisano."  Edwards explains that Special Agent, Susan Palmisano, with the Criminal Investigation Division in the Florence office of the Internal Revenue Service, was investigation a possible failure to pay.   The entry

confirms that Palmisano and Revenue Agent, Tracy Campbell, were investigating the case as a criminal matter.  All of this is shown in Exhibit 009.

30.   Testimony received years later may confirm and indicates that Tracey Campbell left the I.R.S. because of how Susan Palmisano was handling the Shehan tax case.

31.   In the lower half of Exhibit 009, on August 11th, 2005, Revenue Agent, Linda Edwards, again writes, "Field call to the I.R.S. office in Florence, KY to meet with Criminal Investigation regarding fraud potential of the case."  Edwards continues, "Criminal Investigation was made aware of potential fraud by EXAM."

32.    Referring to the pre-sentencing report prepared and submitted to the Federal Court, according to Special Agent, Palmisano, the source of the case was "ANONYMOUS."  See Exhibit 010.    Presenting a conflict in the facts.

33.   However, as confirmed in Exhibit 011, by The Department of Treasury, on September 16th, 2015, the United States clearly states that 8 pages and 12 pages pertaining to Shehan's FOIA request are being withheld because the contents of those documents would reveal the identity of a confidential source.    The identity of Palmisano's "anonymous" source is what Shehan is seeking.

34.   According to I.R.S. Special Agent, U.M., who is connected to Shehan and whose desk was positioned adjacent to Susan Palmisano's desk on the day the allegations against Shehan were submitted; Mr. Bob Zapp, Jr., President & CEO for The Bank of Kentucky filed the allegations.   Shehan received the following message through a common contact, <u>"Bob Zapp at The Bank of Kentucky turned Billy Shehan into the F.B.I. for check kiting, I do not know what this is all about, but get it taken care of as soon as possible because Susan Palmisano doesn't mess around."</u>

35.   The F.B.I. replied to Shehan's 2015 FOIA requests and confirmed that no files existed in relation to Shehan or his companies.   No files pertaining to Shehan exist in records maintained by the F.B.I.

36.   Documents provided by The Department of Treasury and Special Agent, U.M., are consistent and in agreement as to the source of the case.   Evidence, testimony and documentation submitted to the Court by Special Agent, Susan Palmisano, are different at each stage and never consistent.   Palmisano lied to Agent Edwards, lied to the I.R.S. and lied to the U.S. District Court.   Perhaps this speaks to the evidence Internal Affairs Investigators utilized in their investigation years later leading to Palmisano's turbulent termination from employment with the I.R.S. – a matter officials at the I.R.S. attempted to conceal as "retirement".

37.   Adequate evidence suggests that Zapp circumvented channels and procedures when filing a Suspicious Activity report.   Evidence indicates Zapp submitted the report directly to Susan Palmisano rather than mail the report to the FINCIN Headquarters in Detroit, MI where the matter would then be referred to the F.B.I. for investigation.     According to Special Agent, U.M., Bob Zapp's allegations involved check kiting – charges Zapp knew were false but, used as the basis to commence a criminal investigation for illicit purposes.   If following protocol, the matter should have been submitted to FINCIN or the F.B.I. since it is the F.B.I. which has jurisdiction over check kiting, not the I.R.S.

38.   The circumvention of channels and procedures is relevant and speaks to the Bank's desire to control the outcome of the allegations.   Palmisano's concealment of the Bank's role speaks to a coordinated attack with nefarious intent.

39.   More importantly, Palmisano lied to the I.R.S. Revenue Agent as to the source of the case when she told Linda Edwards the source was EXAM.   Palmisano then knowingly filed false documents with the Federal Court when she described the source as "ANONYMOUS."   Palmisano knew on day one, to lie and conceal Zapp's role as the source of the case and the Bank's identity.  This was done to cover and conceal their criminal organization's plans, motives, methods, and network. Palmisano knew or was instructed when it was important to lie and what aspect of the case required concealment.     These details confirm coordination and organization.

40.     Horwitz was shocked to learn, just months later in 2005, that a criminal investigation was underway against Shehan when a squadron of I.R.S. agents descended on Shehan's fabrication facility.  The team of I.R.S. officers raided the facility on the very day when a team of Walt Disney World and Universal Studio artists were working on a variety of projects for Shehan's company.  This "raid" led by I.R.S. Special Agent, Susan Palmisano, brought a long-standing business relationship with The Walt Disney Company and Universal Studios to a sad and devastating end.  From that date forward, Shehan's business was never contacted to do another project for Disney or Universal Studios after having led all major expansions over the ten previous years.     Shehan's company, Larson Theme Construction, led the construction of Disney's Tree of Life and Disney's Animal Kingdom Theme Park.  The scope included thematic finishes, animal habitats, water features and artificial rock work throughout the entire park – the largest animal park in the world.  In addition, Larson led the theme and rock work for Universal Studios Islands of Adventure and SeaWorld's Discovery Cove in Orlando, FL, the world's first swim with dolphin and marine life attraction. Shehan's company, Larson Theme Construction, led many of the most successful destination attractions for Disney, Universal, SeaWorld and many others.  All of that value was destroyed by the United States on the day Susan Palmisano arrived at Shehan's facility in order to execute an I.R.S. raid to benefit the criminal organization centered around The Bank of Kentucky, BB&T Bank, now the Truist Financial Corporation, the result of a $364,000,000 merger.  This merger was made possible and highly profitable by the services of the Federal Court in the Eastern District of Kentucky.

41.     The Creative Artists in Shehan's facility on that day were the same Artists who
        would lead all future multi-million-dollar projects for Disney and Universal
        Studios, and others, from that day in 2005 through 2020.   Damages caused to
        Shehan by the United States and other Defendants are immeasurable.

42.     Once the criminal investigation was underway, and upon learning of prosecutions
        in the Fen Phen matter from front-page headlines, Shehan suggested to Horwitz
        that his testimony as Material Witness Number One in the Fen Phen case should
        be used to bring the tax matter to a conclusion.   With some cash on the table and
        day-one testimony in the Fen Phen case, both thought the tax case would be
        resolved easily and quickly.

43.     However, when tax attorney, Martin Horwitz, offered Shehan's testimony in the
        Fen Phen matter as a path to resolve the tax matter, the United States, D.O.J. /
        I.R.S.,  responded by informing Shehan that if he came forward as a witness against
        Judge Bamberger in the Fen Phen matter, they would prosecute Shehan in the tax
        case.   As a result, Shehan accepted their offer and remained silent for years.

44.     Information now in the Courts, combined with Shehan's testimony, suggests that
        attorney, Stan Chesley, negotiated the Fen Phen crimes with Boone Count Judge,
        Joseph Bamberger, and both officers of the Court escaped prosecution by utilizing
        Shehan's tax case as a method to obtain immunization.   Federal Judge, Susan J.

Dlott, is involved. See letter written from United States Penitentiary Big Sandy, from inmate William C. Shehan, Jr., to Federal Judge, Susan J. Dlott, on file in the Bureau's email computer system.

45.     The 6-year pre-indictment delay is a central aspect and component of this case.

46.     The 6-year gap between the time the I.R.S. learned about the company checks being used to pay personal expenses - and the time of indictment; permitted the United States Department of Justice the time necessary, to protect and shield Boone County Judge, Joseph J. Bamberger, and the Federal Judge's husband, then-attorney, Stan Chesley, from Shehan's testimony in the Fen Phen matter. The illicit use of the tax case also provided shareholders in The Bank of Kentucky immunity from Shehan's testimony in The Bank of Kentucky's scheme to attack Homebuilder, William Erpenbeck, for the premeditated objective of acquiring the value in People's Bank of Crestview Hills, KY.

47.     Exhibit 012, a Memorandum Order prepared by Judge Bunning highlights the legal arguments submitted in relation to the 6-year preindictment delay. As discussed in the Memorandum, Shehan's tax attorney died in 2009. Horwitz's testimony was necessary to establish the impact the Fen Phen matter and People's Bank case was having in Shehan's tax case, from 2002 forward. The Department of Justice was informed of the value attorney, Martin Horwitz, provided in Shehan's defense

having held multiple meetings and discussions with Horwitz.  The loss of Horwitz and his testimony provided the United States a tactical advantage to move against Shehan and conceal crimes committed by the United States.

48.    Shehan was made aware and learned, around 2016 to 2018, about the significance of the 6-year pre-indictment delay and its implication in the tax case.    Upon further study of the evidence, testimony, events and timeline, Shehan discovered how the United States orchestrated the delay to benefit the Defendants in the Fen Phen case, the People's Bank matter, and as a weapon in the Florence Baptist Church case.  Upon discovering these damages and what had been concealed, Shehan immediately wrote about these discoveries and how they are connected to the 6-year pre-indictment delay.  Shehan penned a letter to then-U.S. Attorney General, Jeff Sessions, explaining these issues.    Counsel for the U.S. Attorney General responded by suggesting Shehan obtain private counsel.  However, their letter did not include the funds or methods to pay for private counsel – part of the damages caused by Defendants in the matter.  Shehan reiterates his position: it is not his responsibility to clean up corruption or pay the cost thereof.

49.    Shehan included Claims of the pre-indictment delay in legal actions filed in Judge Bunning's Court related to the Turner Construction, American Museum of Natural History and the U.S. Department of Justice.    In that action, Shehan outlined damages caused by the United States which prevented Shehan from obtaining a contract of more than $44,000,000 to perform work at the American Museum of

Natural History.  The Claim also involved a breach of contract between Turner

Construction and the Saint Elizabeth Healthcare Group related to the new $200

million Cancer Center currently under construction in Edgewood, KY.   An action

related to Turner Construction and the Museum of Natural History is pending

before the New York Supreme Court with many of the same references.  Shehan

intends to refile this action once the new Justice Structure is in place.

50.    The American Museum of Natural History and now the Paycheck Protection

Program are just two of many examples of how damages caused by the United

States, and others, continue to cause damages and inflict suffering on Shehan.

51.    Exhibit 012 demonstrates false statements by U.S. Attorney Grant in relation to

the timing of the indictment as detailed on page 2 of the Memorandum.   Recall

that Shehan's tax case had already been through an audit from 2001 through 2004

when the I.R.S. learned of the company checks to pay personal expenses.   The

audit was then followed by a "criminal investigation" from 2005 through 2007

which produced no new information.   With knowledge of the company checks in

hand since February of 2005, the single charge to which Shehan was forced to

plead guilty, the United States is left with only one explanation for the 6-year

preindictment delay – suppressing Shehan's testimony across three federal cases.

52.   Shehan will provide to this Court, 5 witness who will testify to Shehan's role in the Fen Phen case which was conceived in June of 1998; and Shehan's first-hand knowledge of Judge Joseph Bamberger's scheme to form a "victim's fund", long before the case was filed in Boone County.   Shehan will produce witnesses, documents, and evidence in relation to his knowledge of The Bank of Kentucky's Conspiracy to attack homebuilder, William Erpenbeck, and the value of People's Bank for acquisition by The Bank of Kentucky.

53.   Exhibit 013 provides the Court with a transcript of just one of several audio recordings where the witness is discussing the ex parte meetings and negotiations between Federal Judge, David Bunning, and The Bank of Kentucky's agent, Mr. Richard Knock.     Documents previously filed in District Court demonstrate Richard Knock was last observed fabricating a false set of events related to the Church's losses and submitting the false information to the F.B.I.   The effort to deceive and mislead the F.B.I. are documented in Exhibits 018 through 023.   After sending the F.B.I. on a wild goose chase in the rolling hills of North Carolina, Richard Knock then surfaces in private meetings and ex parte discussions with the Federal Court in the Eastern District of Kentucky, as displayed in Exhibit 013.

54.   During one of those meeting and discussions, Judge Bunning assured Richard Knock that Shehan would receive, not a 27-month sentence as he indicated in the public record, but precisely 24-months, which the Judge negotiated and agreed in secret.   The ex parte meetings with Judge Bunning outside the Court occurred

around the same time the Bank was influencing Officers and Officials of the Federal Court inside the Courthouse. All of this was part of The Bank of Kentucky's efforts to protect the bank's equity value for a pending buyout by BB&T Bank for $364,000,000.    Soon after Judge Bunning assured The Bank of Kentucky and Richard Knock, that Shehan would receive a prison sentence of exactly 24 months, Judge Bunning denied Shehan's request for an extension of time and Shehan was forced to plead guilty.   U.S. Attorney, Bob McBride, had a role in this effort with his threats of perpetual prosecution if Shehan did not plead guilty.  U.S. Attorney, McBride, sicced a team of I.R.S. agents on Shehan's Family to apply additional pressure to bring forth a guilty plea - causing his Family to flee Northern, Kentucky to another state and find refuge.

55.    FOR HIS DEFENSE:    Shehan needed to know Judge Bunning was meeting privately with agents of The Bank of Kentucky.  Shehan needed to know documents and testimony submitted by I.R.S. Special Agent, Susan Palmisano, were false and fabricated.    Shehan needed to know the Bank was coordinating with The Department of Justice and the Internal Revenue Service – all of which was concealed and suppressed.   All this evidence and information is exculpatory.

56.    Exhibit 014 through Exhibit 024 are part of a much larger set of documents which pertain to the losses suffered by The Florence Baptist Church and the actions by The Bank of Kentucky and the Bank's law firms to conceal bank fraud and legal malpractice; including the initiation of federal prosecution to silence Shehan.

57.   Exhibit 014, Exhibit 015 and Exhibit 016 are evidence of the Complaints prepared by attorney, Eric Deters, for The Florence Baptist Church against The Bank of Kentucky and the Bank's law firm Ziegler & Schneider.   The Bank's deception, threats, intimidation, concealment, and other acts prevented these Complaints from reaching the Courts.   Filing of these Complaints were a threat to The Bank of Kentucky's equity value at a time when the Bank was looking for a buyer.

58.   Exhibit 017 demonstrates the Pastor of the Baptist Church was pleased with progress in protecting the Church's interest and happy with Eric Deters leading the legal aspects of the case.   Richard Knock is the person who informed the President for The Bank of Kentucky, Bob Zapp, Jr., that the Church was moving forward with litigation.   The banker made comments about attorney, Eric Deters.

59.   John Cain is Chairman of the Board for The Bank of Kentucky.  As shown in Exhibit 018, Mr. Cain learns of imminent media coverage by the Kentucky Enquirer about the Church's losses on Thursday, June 10th, 2010.   John Cain, on Friday, June 11th, 2010, then forwards information about the media coverage to Mr. Richard Knock as shown in Exhibit 019.   Mr. Knock then calls a meeting with Bob Zapp, Jr., at The Bank of Kentucky to be held "sometime next week."

60.  Bob Zapp, Jr., the Bank's President, informs Knock to move the meeting away from the Bank's offices and the Banker avoids attending the meeting because of the criminal liability connected to the purpose of the meeting.

61.  The Kentucky Enquirer runs the story about the Church and subcontractor's losses on Sunday, June 13th, 2010, as shown in Exhibit 020.   Because of this frontpage news article, the Church's leaders addressed the congregation with only a portion of the necessary information - on that Sunday morning.

62.  Exhibit 021 confirms Richard Knock held a meeting on Monday, June 14th, 2010. John Cain informed Shehan after the meeting that Pastor Alexander was in attendance and the meeting was held at the Triple Crown Country Club.   As the text indicates, Shehan did not know Pastor Alexander was invited to the meeting- without Shehan.   The purpose was to isolate the Pastor, deceive him, and send him to the F.B.I. as Richard Knock eludes to in his previous email messages with John Cain.

63.  On Tuesday, June 15th, 2010, Pastor Alexander memorializes the purpose and discussions during the meeting held the previous day when he issued the emails shown in Exhibit 022 and Exhibit 023.   Compare the turn of events and perspectives to Exhibit 017 where Pastor Alexander expressed his satisfaction and pleasure with Shehan, attorney, Eric Deters, and the path the Church was pursing

to obtain compensation for damages.  Damages included, $ 2,200,000 in errors and omissions losses caused by an engineering firm; $1,200,000 in subcontractor liens and millions in a toxic mortgage, plus interest and legal fees – resulting in a multi-million dollar bank fraud action against the Bank of Kentucky and the Bank's law firm at a time when the Bank was positioning to be acquired.

64.    The most significant losses to the Church are in relation to the $2,200,000 in losses connected to the errors & omissions claim against the project's engineer. The Bank's law firm, also serving a counsel to the Church at the time, failed to file a legal claim on behalf of the Church after being retained thirty-three months earlier.    The law firm's failure constitutes legal malpractice followed by a Conspiracy to conceal legal malpractice.    The statute of limitations is twelve months and by that time, thirty-three months had passed.    In Exhibit 021, the Court will observe the reference for Ziegler & Schneider to turn the matter into their insurance indicating an errors and omissions claim.  Regardless, the purpose of the meeting on June 14th, at the Triple Crown Club, was to deceive the Pastor into believing the Bank had all lien releases on file and the Bank had carried-out its legal responsibilities to collect the lien releases before issuing funds from the Church's credit facility of $8,000,000.

65.    After months of deception, threats, and intimidation, Shehan discovered The Bank of Kentucky had issued all $8,000,000 of the Church's credit facility without a single lien release on file – and lied about it.    It is simple to understand:    If the

Bank has the lien releases, "on file and in order," as the Bank insisted for over six month, then Shehan said to the bankers, "Please give us the lien releases so we can remove the liens from the Church's property." The Bank of Kentucky never produced a single lien release and retaliated with prosecution of Shehan.

66.   The fact is The Bank of Kentucky never collected a single lien release and never visited the project site to inspect the progress of the work. All of the details which Richard Knock gave to Pastor Alexander in Monday's meeting are false – it never happened, and the Bank enlisted the support of Richard Knock to deceive the Pastor into believing the Bank had done everything right. Exhibit 022 confirms bank fraud committed against the Church. Moreover, Richard Knock does not work for the Bank and Richard Knock was never involved in any of the transactions between the Church, Bank and contractors – so Richard Knock would not know or have first-hand knowledge of what did or did not happen. Someone had to tell Richard Knock what to say to the Pastor. The events and actions described in Exhibit 022 accurately describe bank fraud committed against the Church where both the Bank and law firm Conspired to conceal their failures and the subsequent efforts to cover up the losses.

67.   The lowest risk solution was to turn the matter into their errors and omissions insurance carrier. Documents will demonstrate the Church offered to pay their deductible to encourage the bank and law firm to roll-over onto their insurance coverages. As an indication of the level of corruption, both the bank and law firm

declined to utilize their insurance and chose a different path.   The bank and law firm knew in advance, they could rely on Federal Officials in the U.S. District Court for the Eastern District of Kentucky, to profit and protect the Bank – as the Court had done many times before.   Therefore, the Bank initiated prosecution of Shehan in the tax case; the same tax case the Banker conceived in 2005, the same tax case just used for 6 years to protect Judge Bamberger and Stan Chesley – was now was being utilized as a weapon to protect the Bank's profits and equity value.

68.   Richard Knock informed Pastor Alexander to take those false details and events, as describe in Exhibit 022, and submit the false information to the F.B.I. and instruct the F.B.I. to pursue Kodiak Constructors.   The purpose was to direct the F.B.I. away from the Bank of Kentucky and toward others.   Exhibit 023 demonstrates that Pastor Alexander contacted the F.B.I. and sent the F.B.I. toward Kodiak Constructors - where no criminal liability existed.   Furthermore, to send the F.B.I. after Kodiak, would cause the Church to immediately incur a loss of $2,200,000 related to the engineering failure, simply because Kodiak was lead witness in that E&O case.   Sending the F.B.I. after Kodiak served only the shareholders in The Bank of Kentucky and forced millions in losses on the membership of the Baptist Church.

69.   Pastor Alexander met F.B.I. Agent, Dennis Swikert, and provided him Shehan's cell number and informed him Shehan was handling the Church's legal matters and was the last to speak to Kodiak.   It is unknown why the F.B.I. never contacted

Shehan to review the documents now before the Court.   Pastor Alexander was

diagnosed with stage-four lung cancer just weeks later and died in December 2103.

70.   Just ninety days after the Bank's President issued threats to prosecute Shehan, U.S.

Attorney, Bob McBride, contacted Shehan's counsel to inform him that the United

States was moving forward with prosecution in the tax case.   Exhibit 024 indicates

an indictment was obtained on November 10th, 2010.   However, U.S. Attorney,

Bob McBride, failed to inform and withheld from the Grand Jury, a mountain of

material evidence, exculpatory evidence and other information, including but not

limited to, the fact Shehan's testimony was being suppressed in two prior federal

cases.

71.   Soon after the criminal prosecution was underway, Richard Knock surfaces in

private discussions and ex parte meetings with Federal Judge, David Bunning.

According to witness statements, Knock told the Bankers he would "make this

whole thing work out."   In addition, according to the witness, Richard Knock was

paid by the Bank - a quid pro quo for services rendered - in gaining the support of

the Federal Court to protect the Bank's value.

72.   Richard Knock was a long-time supporter of Judge Bunning's Father and hosted

the former Congressman at Knock's home in Omaha Trace in Triple Crown.   It is

unknown if Knock participated in the Bank's buyout. It is perceived, but unknown and unconfirmed, if the Bunning Family are shareholders in The Bank of Kentucky.

73.   It is currently unknown what benefit Louis DeFalaise and Susan Palmisano may have received in exchange for their services in implementing the Federal government's power and authority to benefit shareholders in the Bank.

74.   The legal malpractice, bank fraud, unpaid subcontractors, toxic mortgage and $20 million in losses forced on the membership of The Florence Baptist Church – form the motive and basis for the Bank's ex parte meetings and negotiations with the Federal Judge and Officials of the Court. The Conspiracy was broader and involved influence over other Federal Officials in the U.S. District Court in the Eastern District of Kentucky, and others. The State of Kentucky joined the Bank's Conspiracy by initiating prosecution of Shehan at the same time.

75.   Recall the spectacular prosecution of homebuilder, William Erpenbeck, and subsequent attack on the value of People's Bank of Crestview Hills, KY, by The Bank of Kentucky. The People's Bank matter, when the smoke settled, involved just $7 million in losses compared to bank fraud of $20 million in the Baptist Church's case. Both involved unpaid subcontractors and toxic mortgages. However, in the People's Bank saga, the F.B.I.'s performance was dramatically

different compared to The Florence Baptist Church where, even after ten years, the F.B.I. shows no interest.

76.     The two cases are virtually identical in components and content.   Comparing the two cases, the Court will observe excessive corruption by the United States Department of Justice in attacking the value in People's Bank's where the premeditated and stated goal was to take down, William Erpenbeck, and deliver People's Bank into the arms of The Bank of Kentucky.   In the Church's case, the Department of Justice, after suppressing Shehan's testimony in the People's Bank and Fen Phen case for almost six years, launched itself like a guided-missile to attack Shehan as necessary to preserve the equity value of The Bank of Kentucky for a pending buyout of $364,000,000.

77.     The Bank of Kentucky, and others, routinely utilize the Federal Bureau of Investigation and U.S. Department of Justice as their guns-for-hire, private assassination squad – against U.S. Citizens!

78.     An injustice anywhere, is a threat to Justice everywhere. – HRH, M.B.R.

79.     Shehan restates the demand for all Federal Officials, Federal Judges and others involved in the Bank's decades-long Conspiracy to be prosecuted to the fullest

extent provided by law.   The damages to Shehan, his family and businesses are immeasurable.

80.     Shehan has not received the benefit of discovery which was first requested in 2014. The Plaintiff reserves the right to modify, change, update, correct and expand the scope of this Complaint as determined necessary.   Damages caused by Defendants prevents Shehan for obtaining qualified counsel.  Any damages incurred, mistakes, errors or rights lost because of the lack of qualified counsel shall be deemed additional damages for which future Claims shall be made.

_____

81.     Returning to the Paycheck Protection Program and the Small Business Loan. Shehan has voluntarily provided a mountain of evidence and details supporting his Claims and Allegations against the Defendants named in the First Action submitted January 31st, 2020 to the Appeals Court.   As demonstrated here, the evidence is substantial and meaningful.

82.     When Shehan applied for the small business loans, the online forms required answers to questions related to felony convictions, unpaid restitution, tax liens, unpaid taxes, unpaid child support, credit ratings, tax forms and financial statements – all damages caused by the Defendants connected to the Bank  - none

of which the Plaintiff has the ability to address and resolve without assistance from the United States and or the Court.

83.    Shehan files this Action with the purpose of bringing the United States Department of Justice, now under new leadership, to his assistance.  Firstly, to clear the path and allow Shehan to secure benefits in the Paycheck Protection Program, and Secondly, to pursue justice in the Conspiracy outlined in this and all previous filings in the Federal Court system.

84.    If not for the damages caused by Defendants, Shehan and his company would qualify under the P.P.P. and have all the necessary documents to provide to PNC Bank.

85.    Moving back to the S.B.A. applications, Shehan can offer proceeds from the First Action as collateral.   Shehan is offering to secure the loans through a U.C.C. lien filed by the S.B.A. against the proceeds from Shehan's legal action against the Defendants in the First Action.    Although, up to 75% of the PPP funds are forgivable.

86.    The water park project impacted by the covid-19 virus involves an opportunity to create more than 28 jobs which last approximately 90 days or more. Benefits

provided by the P.P.P. present a mutually beneficial opportunity for Shehan's business by providing funding to cover payroll, subcontractor, staffing, consulting, and on-site construction costs for a period of 90-days.   The capital will put people who are currently not working, back to work.

87.   From another perspective, the Banks which inflicted damages on Shehan and his business as described in the First Complaint, are now partners with the federal government and profiting in the P.P.P – while Shehan is left out.

88.   Moreover, many of the other Defendants in the January 31st, 2020 Complaint are also receiving benefits from the P.P.P. – while Shehan, the victim as described in the First Action – is barred from benefiting in the P.P.P.   This translates to additional injuries to Shehan – during an economic crisis!

89.   Shehan has remained patient while waiting for Justice to be served since filing the first legal action on April 9th, 2014, in Kenton County Court.  The action was filed before BB&T announced the buyout of The Bank of Kentucky.  More importantly, BB&T President & CEO, Mr. Kelly S. King, with full knowledge of the damages caused to Shehan, presented false testimony to deceive the Kenton County Court. Attorneys for BB&T, Ziegler & Schneider, informed the Court that the Bank had no contact with law enforcement or the I.R.S. in relation to Shehan's tax case.

According to Special Agent, U.M., the eight pages and twelve pages held by the Department of Treasury in Shehan's FOIA request, will prove otherwise.

90.     Therefore, Shehan is out of time and out of options.   If not for the actions and damages caused by Defendants in the First Action, including the United States Department of Justice, BB&T, Truist Financial Corporation, and others, Shehan's company would qualify for full benefit under the Paycheck Protection Program.

91.     As a result, William C. Shehan, Jr., files this Complaint with the UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY, requesting relief.   The purpose of this Complaint is to seek relief and obtain equal protection under the law.

_____

Date:   **May 12th, 2020**

## PRAYER FOR RELIEF

A.  Trial by Jury.

B.  Judgement for the Plaintiff on all Claims for Relief as provided by law.

C.  Judgement against the Defendants, jointly and severally, for compensatory and consequential damages, including without limitation lost income, out of pocket expenses, and mental anguish, all in amounts to be determined at trial;

D.  The right to amend the Complaint to add additional named parties and factual allegations as revealed in discovery.

E.  Punitive damages in an amount to be determined at trial;

F.  Reasonable cost of suit;

G.  Pre-judgement interest on each unreimbursed claim at a rate of 12%;

H.  Post judgement interest at a rate of 18%; and

I.  Any and all other relief to which Plaintiff may be entitled

## **VERIFICATION**

After being dully sworn, I, William C. Shehan, Jr., have personal knowledge concerning the matters set forth in the foregoing Complaint, and do hereby verify, certify, swear and affirm that the information and allegations contained in the foregoing Complaint are true and accurate to the best of my information, knowledge and belief.

**Respectfully submitted,**

_____

**William C. Shehan, Jr.**

903 Riva Ridge

Union, KY 41091

(859) 653-3802

Pro se Plaintiff

May 12th, 2020